IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | |
|---|---|
| The Stansley Group, | Case No. 3:05 CV 7023 |
| Plaintiff, | MEMORANDUM OPINION AND ORDER |
| -vs- | JUDGE JACK ZOUHARY |
| Fru-Con Construction Corp., et al., | |
| Defendants. | |

This matter is before the Court on cross Motions for Summary Judgment (Docket Nos. 35 and 38) asking the Court to decide whether Defendant Burlington Insurance Company (Burlington) is obligated under a commercial general liability policy to defend and indemnify Plaintiff The Stansley Group (Stansley) for claims arising out of a construction contract with Fru-Con Construction Corporation (Fru-Con). Fru-Con filed a Counterclaim against Stansley (Docket No. 5) and has denied a duty to defend and indemnify.

**FACTUAL BACKGROUND**

Fru-Con and Stansley signed a purchase order relating to the construction of a bridge on Interstate 280. Pursuant to the purchase order, Stansley provided cement for eleven lower pylons, all of which met the required 10,000 psi compressive strength. Stansley also provided cement for upper pylon lift 1 (also known as pylon lift 12) on January 13, 2004 and for upper pylon lift 2 (also known as pylon lift 13) on February 3, 2004. Fru-Con alleges that upper pylon lifts 1 and 2 did not meet

10,000 psi and did not conform to Ohio Department of Transportation inspections. These pylons were demolished and replaced. Stansley filed a claim against Fru-Con for payments owed and Fru-Con counterclaimed for breach of contract, breach of express and implied warranties, breach of implied warranty for performance in a workmanlike manner, right to set off or recoupment, and negligence. Fru-Con alleges damages of over $809,000 plus future and consequential damages, including loss of use of monies owed, interest, costs of construction delays, reasonable attorney fees, unabsorbed home office overhead, and other such costs as the Court may award in its discretion.

## SUMMARY OF ARGUMENTS

Stansley alleges two duties owed by Burlington: the duty to defend Stansley in the Counterclaim and the duty to indemnify Stansley from any damages that it may owe to Fru-Con. The underlying contractual obligations arise from Commercial General Liability Policy No. HGL0004006 (the CGL policy).

### Duty to Defend

The duty of an insurance company to defend an action against an insured is determined by the scope of the allegations of the claim. *Motorists Mutual Insurance Co. v. Trainor*, 33 Ohio St.2d 41, ¶2 of the syllabus (1973). "[When] the complaint brings the action within the coverage of the policy, the insurer is required to make the defense, regardless of the ultimate outcome of the action or its liability to the insured." *Id*. The duty to defend may exist even though the allegations are groundless, false or fraudulent. *Erie Insurance Exchange v. Colony Development Corp.*, 136 Ohio App.3d 406, 412 (10th Dist. 1999). Even when the action is not clearly within the policy coverage, but the allegations could arguably or potentially state a claim within the policy coverage, the insurer still has a responsibility to defend the entire action. *Sanderson v. Ohio Edison Co.*, 69 Ohio St.3d 582, 586

2

(1994); *Willoughby Hills v. Cincinnati Ins. Co.*, 26 Ohio App.3d 146, syllabus (11th Dist. 1986). "Only if there is no possibility of coverage under the policy based on the allegations in the complaint will the insurer not have a duty to defend the action." *Erie*, 136 Ohio App.3d at 413.

Under the CGL policy, Burlington promised to defend Stansley against any suit seeking property damage or bodily injury damages to which the policy applies. The CGL policy applies to (1) "occurrences" that took place in (2) "coverage territory" and (3) which were not excluded by the policy. There is no dispute that the bridge site was within the coverage territory. Property damage to pylon lifts 12 and 13 resulted from their removal. The allegations in this case are that Stansley delivered defective cement to Fru-Con, necessitating removal and replacement of the defective cement.

### Does the Counterclaim Constitute an "Occurrence"?

**Burlington's Argument**. Burlington claims that Stansley's defective workmanship is not covered by the CGL policy because it is not an occurrence as defined by the CGL policy and under the definitions given to "occurrence" by Ohio appellate courts and other state courts.

The CGL policy defines "occurrence" as an "accident, including continuous or repeated exposure to substantially the same general harmful conditions." Burlington maintains that defective workmanship is not an accident, and that the damages alleged do not arise from an occurrence.

Burlington cites Ohio appellate cases from the First and Eleventh Districts to support its position. In *Heile v. Herrmann*, 136 Ohio App.3d 351 (1st Dist. 1999), where the definition of "occurrence" was identical to the definition at issue, the court held that "defective workmanship is not what is meant by the term 'accident' under the definition of 'occurrence.'" *Id*. at 354. This conclusion is based upon the principle that "policies do not insure an insured's work itself; rather, the

3

policies generally insure consequential risks that stem from the insured's work." *Id.* at 353. The *Heile* court also explained that CGL policies are not intended to protect business owners from "business risks," which are those risks that are the "normal, frequent, or predictable consequences of doing business, and which business management can and should control or manage." *Id.* In *Rombough v. Angeloro*, No. 97-L-131, 1998 WL 553148 (11th Dist. 1998) the court found that a claim of failure to perform in a workmanlike manner did not allege an accident, and therefore did not allege an occurrence. *Id.* at *1-2. Under this analysis, CGL policies "do not insure an insured's work itself; rather, the policies generally insure consequential risks that stem from the insured's work." *Heile,* 136 Ohio App.3d at 353.

Burlington also cites cases from the Supreme Courts of Iowa and New Hampshire, and courts of appeal from Michigan and Arizona.[1] These cases support the argument that "mere faulty workmanship, standing alone, cannot constitute an occurrence as defined in the policy, nor would the cost of repairing the defect constitute property damages." *US Fidelity &Guarantee Corp. v. Advance Roofing & Supply*, 163 Ariz. 476, 482 (1989).

**Stansley's Argument**. Stansley argues that defective workmanship is an occurrence and cites Ohio case law that has held the word "occurrence" to be much broader than "accident," and defines "accident" as being unexpected and unintended. *Grand River Lime Co. v. Ohio Cas. Ins. Co.*, 32 Ohio App.2d 178, 185 (10th Dist. 1972); *Hybud Equip. Corp. v. Sphere Drake Ins. Co.*, 64 Ohio St.3d 657, 666 (1992).

---

[1] *Pursell Construction v. Hawkeye-Security Insurance*, 596 N.W.2d 67 (Iowa 1999); *McAllister v. Peerless Insurance Co.*, 124 N.H. 676 (1984); *US Fidelity &Guarantee Corp. v. Advance Roofing & Supply*, 163 Ariz. 476 (1989); and *Hawkeye-Security Insurance Co. v. Vector Construction Co.*, 185 Mich. App. 369 (1990).

Stansley also cites *Acme Construction Co., Inc v. Continental National Indemnity Co.*, No. 71420, 2003-Ohio-434 (8th Dist. 2003), to support its argument. In *Acme*, the Eighth District recognized that Ohio case law "overwhelmingly indicates that allegations that a contractor failed to fulfill its duties in constructing or designing that which it had constructed, constitute an 'occurrence'." *Id.* at ¶11. The *Acme* court based its opinion on *Zanco, Inc. v. Michigan Mutual Ins. Co.*, 11 Ohio St.3d 114 (1984) (holding that while the defective workmanship may be an occurrence under the general provision of a CGL policy, the insurer did not have a duty to defend because defective workmanship was excluded from coverage through policy exclusions). *Acme*, 2003-Ohio-434, at ¶11, n. 8.

In *Zanco*, the Ohio Supreme Court stated that "although a perfectly credible argument can be made that the [defective workmanship] allegations in the . . . counterclaim were within these initial provisions for coverage, the insurance contracts must be examined in their entirety to determine if there are any applicable exceptions to their coverage." *Zanco*, 11 Ohio St.3d at 116. Thus, the *Zanco* court recognized the possibility that a claim of breach of duty to act in a workmanlike manner may be an occurrence for purposes of determining an insurer's obligations.

Ohio appellate courts in the Eighth and Tenth Districts have followed the Ohio Supreme Court's holding. These courts note that recognizing defective workmanship as an occurrence still supports the public policy that insurers do not insure the insured's work quality because exclusion policies for defective workmanship are standard in the CGL insurance industry. *Hahn's Electric Co. v. Cochran*, Nos. 01 AP-1319, 01AP-1394, 2002-Ohio-5009, at ¶38 (10th Dist. 2002) . With these standard exclusions, the policy ensures that liability insurance does not become a warranty or performance bond for contractors but instead helps to discourage careless work. *Id.* at ¶38.

Additionally, Stansley cites *Akron Brick & Block v. Travelers Insurance Co.*, No. 11092, 1983 WL 3931 (9th Dist. 1983) for the proposition that an insured "may" be protected by liability coverage for defective products, however, since the case did not involve defective products, the *Akron Brick* court did not analyze when protection is available. *Id.* at *5.

Alternatively, if defective workmanship is not itself an occurrence, Stansley argues Fru-Con is not seeking reimbursement for the allegedly defective cement and urges this Court to follow a number of cases allowing coverage for "collateral damages" -- those damages arising out of defective material or workmanship. In *Bundy Tubing Co. v. Royal Indemnity Co*, 298 F.2d 151, 154 (6th Cir. 1962), the court did not allow recovery for the replacement of defective steel tubing, but did allow for possible damages flowing from the defective tubing. In *Dewitt Construction, Inc. v. Charter Oak Fire Insurance*, 307 F.3d 1127, 1138 (9th Cir. 2002), the cement did not harden properly and while recovery for removal of the defective cement itself was not an occurrence, recovery for damage to other subcontractors' work and buried pipes during removal was a covered occurrence. In *Yakima Cement Products v. Great American Insurance*, 93 Wash.2d 210, 215, 608 P.2d 254 (1980), the Supreme Court of Washington held that defective manufacture of cement was determined to be an accident and thus an occurrence, since it was unintentionally mis-manufactured. However, since the only damage was to the defective materials and for project delay, no property damage occurred and there was no coverage. *Id.* at 223. These cases are helpful for Stansley only if facts of collateral damage are proven.

Stansley essentially argues that collateral damages have been alleged because "it is impossible to separate the batches of concrete comprising pylons 12 and 13 that may have met compressive strength from those that did not" (Memorandum in Opposition at p. 11). In *Moraine Materials v.*

6

*Ohio Casualty Ins. Co.*, No. 6284, 1979 WL 208510, (2nd Dist. 1979), Moraine delivered defective batches of concrete to be used in a retaining wall. "The defective concrete was incorporated into a wall that otherwise contained good concrete, with the result that the entire wall, both that part which was good and that part which was defective, had to be removed." *Id.* at *2. Because it was impossible to separate the good concrete from the bad concrete, the *Moraine* court used this "defective component analysis" to hold the policy covered the damage. *Id.* at *3.[2]

*Moraine* suggests that Burlington may have a duty to defend Stansley if the good and bad concrete are unable to be separated in upper pylons 12 and 13. The destruction of the good concrete may constitute an unanticipated collateral consequence, arising out of defective workmanship, and not a business risk, under the *Heile* analysis mentioned above.

**Analysis**. While the Supreme Court of Ohio has not held that defective workmanship allegation is an occurrence, the Sixth Circuit noted that "the majority of courts to consider the issue have concluded that policies do not provide coverage where the damages claimed are the cost of correcting the work itself, even in the context of the broad protections offered by a [CGL policy] . . . ." *Lenning v. Commercial Union Ins. Co.*, 260 F.3d 574, 583 (6th Cir. 2001).

An article, cited by the *Heile* court, states that "[c]overage analysis largely turns on the damages sought. If the damages are for the insured's own work, there is generally no coverage. If the damages are consequential and derive from the work the insured performed, coverage generally will lie. The underwriting intent is to exclude coverage for the contractor's business risks, but provide

---

[2] While Stansley cites *Moraine* to support its argument regarding Exclusion j(6) of the CGL policy, the *Moraine* analysis is more correctly applied to the collateral damages analysis as the *Moraine* court did not specifically address Exclusion j(6), and the insurance provisions discussed were different from the Burlington provisions.

7

coverage for unanticipated consequences." Franco, *Insurance Coverage for Faulty Workmanship Claims Under Commercial General Liability Policies* (1994), 30 TORT AND INS. L.J. 785, 785-87. This Court agrees, and to the extent the Counterclaim is for defective workmanship, there is no coverage under the occurrence provision of the CGL policy.

The Court finds, however, that the current record contains disputed issues of material fact as to whether the damages sought are solely for the defective workmanship, or include collateral or consequential damages. Stansley cites the *Moraine* case to show that damage to any property, other than the defective cement, can be classified as collateral damage. However, other Ohio courts have held that collateral damage is limited to damage caused by external factors. *See Interstate Properties v. Prasanna, Inc.,* Nos. 22734 and 11757, 2006-Ohio-2686, at ¶45 (9th Dist. 2006) (damage to other property caused by excess water flowing through a defective roof or an improperly installed drainage system).

Clearly, if the damages sought by Fru-Con are limited to repair and replacement of Stansley's work because of defective cement, this would not require Burlington to defend and indemnify Stansley. If, however, the damages sought are more in the nature of collateral damages, then it is Burlington's duty to defend and indemnify. Again, because the record, as confirmed by oral argument, is unclear as to the total scope of damages, material facts remain in dispute and this issue cannot be decided on summary judgment.

### Exclusion j(6) - Damage to Property

Even if this Court were to find defective workmanship to be an occurrence, courts routinely find that an exclusion will apply for damage to the insured's own work. Counsel for Burlington

conceded at oral argument that, although arguing a number of exclusions that would prevent coverage, Exclusion j(6) is the focus of its argument.[3]

This exclusion is commonly known as the "faulty workmanship exclusion." The policy excludes "property damage to . . . that particular part of any property that must be restored, repaired or replaced because 'your work' was incorrectly performed on it." "Your work" means "work or operations performed by you or on your behalf", and "materials, parts or equipment furnished in connection with such work or operations." It also includes any warranties or representations about fitness, quality, durability, performance or use of "your work."

Ohio courts have held that j(6) is a "business risk" exclusion, designed to exclude coverage for the risks inherent in performing a particular type of work. *LISN v. Commercial Union Ins. Co.*, 83 Ohio App.3d 625, 630 (9th Dist. 1992). "The replacement or repair of faulty goods or workmanship is a business expense and not an insurable liability." *Id.* at 629-30. In construing an identical exclusion, Ohio courts have held that the exclusion "excludes coverage for **any** repairs which become necessary due to the fact that the insured's work was incorrectly performed." *Camp Frederick, Inc. v. D & G Enterprises, Inc.,* No. 98 CO 70, 1999 WL 1138551, at *4 (7th Dist. 1999) (emphasis added).

This exclusion turns then on whether Stansley's work, as defined by the policy, was incorrectly performed. If substantially all the concrete was defective, Exclusion j(6) would apply and free Burlington of any duty to defend on damages occurring during operations. Again, because the

---

[3] Exclusions k, l, m, and n apply to damages occurring after operations are completed and counsel agreed that operations were not completed at the time of this incident. Exclusion j applies to the extent damage occurred during operations.

9

record, as confirmed by oral argument, is unclear, including the plant source of this "bad" concrete, the Court is unable, at this stage of the case, to determine whether this exclusion applies.

## CONCLUSION

Based on a review of the pleadings, the summary judgment memoranda and oral argument on August 31, 2006, the Court finds there are disputed issues of material fact and therefore both Motions for Summary Judgment (Docket Nos. 35 and 38) are denied.

IT IS SO ORDERED.

                                       s/ *Jack Zouhary*
                                       JACK ZOUHARY
                                       U. S. DISTRICT JUDGE

September 21, 2006